IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:15-CV-478-FL

| | | |
|---|---|---|
| MARISA BELTRAN HOOKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

In this action, plaintiff Marisa Beltran Hooker ("plaintiff" or, in context, "claimant") challenges the final decision of defendant Acting Commissioner of Social Security Carolyn W. Colvin ("Commissioner") denying her application for supplemental security income ("SSI") on the grounds that she is not disabled. The case is before the court on the parties' respective motions for judgment on the pleadings. (D.E. 17, 21). Each party filed a memorandum in support of its motion. (D.E. 18, 22). The motions were referred to the undersigned magistrate judge for a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* 11 May 2016 Text Order). For the reasons set forth below, it will be recommended that the Commissioner's motion be granted, plaintiff's motion be denied, and the Commissioner's final decision be affirmed.

# BACKGROUND

## I.  CASE HISTORY

Plaintiff filed an application for SSI on 12 December 2012.  Transcript of Proceedings ("Tr.") 22, 58 block no. 3.[1]  She also filed an application for a period of disability and disability insurance benefits ("DIB") on 12 December 2012.  Tr. 11.  In both applications, she alleged a disability onset date of 1 November 2009.[2]  *See* Tr. 190, 193.  The applications were denied initially and upon reconsideration, and a request for hearing was timely filed.  Tr. 11.  On 27 August 2014, a hearing was held before an administrative law judge ("ALJ"), at which plaintiff and a vocational expert testified.  Tr. 24-56.  At the hearing, plaintiff amended her alleged onset date to 16 March 2012, which had the effect of her abandoning her claim for DIB.  *See* Tr. 11, 28.  In a written decision dated 9 October 2014, the ALJ dismissed plaintiff's application for DIB and found that plaintiff was not disabled and therefore not entitled to SSI.  Tr. 11-22.  Plaintiff timely requested review by the Appeals Council.  Tr. 7.  On 31 August 2015, the Appeals Council admitted additional evidence (Tr. 500-17), but denied the request for review.  Tr. 1-6. At that time, the decision of the ALJ became the final decision of the Commissioner.  20 C.F.R. § 416.1481.  Plaintiff commenced this proceeding for judicial review on 16 September 2015, pursuant to 42 U.S.C. § 1383(c)(3).  (*See In Forma Pauperis* ("IFP") Mot. (D.E. 1); Order Allowing Am. IFP Mot. (D.E. 5); Compl. (D.E. 6)).

---

[1] The ALJ erroneously states at the outset of his decision that plaintiff filed the application for SSI on 1 November 2009, the original date of alleged onset of disability.  *See* Tr. 11, 193.

[2] The ALJ erroneously states 16 March 2012 as the alleged disability onset date given in the applications.  Tr. 11. As the ALJ's decision indicates, at the hearing, plaintiff amended her alleged onset of disability to this date.  *See* Tr. 11, 28.

## II.    STANDARDS FOR DISABILITY

The Social Security Act ("Act") defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).  The Act defines a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(D).  "[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  *Id.* (a)(3)(B).

The disability regulations under the Act ("Regulations") provide a five-step analysis that the ALJ must follow when determining whether a claimant is disabled:

> To summarize, the ALJ asks at step one whether the claimant has been working; at step two, whether the claimant's medical impairments meet the regulations' severity and duration requirements; at step three, whether the medical impairments meet or equal an impairment listed in the regulations; at step four, whether the claimant can perform her past work given the limitations caused by her medical impairments; and at step five, whether the claimant can perform other work.

> The first four steps create a series of hurdles for claimants to meet. If the ALJ finds that the claimant has been working (step one) or that the claimant's medical impairments do not meet the severity and duration requirements of the regulations (step two), the process ends with a finding of "not disabled."  At step three, the ALJ either finds that the claimant is disabled because her impairments match a listed impairment or continues the analysis.  The ALJ cannot deny benefits at this step.

If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity ["RFC"], which is "the most" the claimant "can still do despite" physical and mental limitations that affect her ability to work. [20 C.F.R.] § 416.945(a)(1). To make this assessment, the ALJ must "consider all of [the claimant's] medically determinable impairments of which [the ALJ is] aware," including those not labeled severe at step two. *Id.* § 416.945(a)(2).

The ALJ then moves on to step four, where the ALJ can find the claimant not disabled because she is able to perform her past work. Or, if the exertion required for the claimant's past work exceeds her [RFC], the ALJ goes on to step five.

At step five, the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that "exists in significant numbers in the national economy," considering the claimant's [RFC], age, education, and work experience. *Id.* §§ 416.920(a)(4)(v); 416.960(c)(2); 416.1429. The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations. If the Commissioner meets her burden, the ALJ finds the claimant not disabled and denies the application for benefits.

*Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir. 2015).

## III. ALJ'S FINDINGS

Plaintiff was 39 years old on the amended date of alleged onset of disability and 41 years old on the date of the administrative hearing. *See* Tr. 21 ¶ 6. The ALJ found that she has a limited education. Tr. 21 ¶ 7; *see also* Tr. 29 (plaintiff's testimony that she completed eighth grade); 20 C.F.R. § 416.964(b)(3) (defining limited education generally as the seventh through eleventh grade level of formal education). Plaintiff had past relevant work as a cashier, scanner, deli clerk, and cleaner. Tr. 20 ¶ 5.

Applying the five-step analysis of 20 C.F.R. § 416.920(a)(4), the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since the amended alleged disability onset date. Tr. 13 ¶ 1. At step two, the ALJ found that plaintiff had the following medically determinable impairments that were severe within the meaning of the Regulations: bipolar disorder, obesity, and arthritis of the knees. Tr. 13 ¶ 2. At step three, the ALJ found that

plaintiff's impairments did not meet or medically equal any of the Listings, including Listings 12.04 and 1.02. Tr. 13-15 ¶ 3.

The ALJ next determined that plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 416.967(b),[3] subject to the following limitations:

> [T]he claimant is limited to standing and walking four hours in an eight hour day; the ability to push and pull with the lower extremit[ies][4] was on an occasional basis; she can use[,] traverse stairs, bend, stoop, kneel, crouch, and crawl on an occasional basis; the claimant is limited to simple, routine, repetitive tasks in an environment with only occasional interaction with other workers or supervisors or the public.

Tr. 15 ¶ 4.

Based on his determination of plaintiff's RFC, the ALJ found at step four that plaintiff had no past relevant work. Tr. 20 ¶ 5. At step five, the ALJ accepted the testimony of the vocational expert and found that there were jobs in the national economy existing in significant numbers that plaintiff could perform, including jobs in the occupations of folder, laundry; shipping and receiving weigher; and electronic worker. Tr. 21 ¶ 9. The ALJ accordingly concluded that plaintiff was not disabled from the amended alleged disability onset date, 16 March 2012, through the date of the ALJ's decision, 9 October 2014. Tr. 22 ¶ 10.

## IV. STANDARD OF REVIEW

Under 42 U.S.C. § 1383(c)(3), judicial review of the final decision of the Commissioner is limited to considering whether the Commissioner's decision is supported by substantial evidence in the record and whether the appropriate legal standards were applied. *See Richardson*

---

[3] The regulation provides, in part, that "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b); *see also Dictionary of Occupational Titles* (U.S. Dep't of Labor 4th ed. rev. 1991) ("DOT"), app. C § IV, def. of "L-Light Work," 1991 WL 688702. "Light work" and the other terms for exertional level as used in the Regulations have the same meaning as in the DOT. *See* 20 C.F.R. § 416.967.

[4] Although the ALJ uses the singular "extremity" in his statement of plaintiff's RFC, he used the plural in his hypothetical to the vocational expert, upon whose resulting testimony about the availability of jobs to plaintiff the ALJ relied. *See* Tr. 21-22 ¶ 9; 50-51.

*v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Unless the court finds that the Commissioner's decision is not supported by substantial evidence or that the wrong legal standard was applied, the Commissioner's decision must be upheld. *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla of evidence, but somewhat less than a preponderance. *Perales*, 402 U.S. at 401.

The court may not substitute its judgment for that of the Commissioner as long as the decision is supported by substantial evidence. *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). In addition, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979). A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion. *Blalock*, 483 F.2d at 775.

Where, as here, the Appeals Council considers additional evidence before denying the claimant's request for review of the ALJ's decision, "the court must 'review the record as a whole, including the [additional] evidence, in order to determine whether substantial evidence supports the Secretary's findings.'" *See, e.g., Felts v. Astrue*, No. 1:11CV00054, 2012 WL 1836280, at *1 (W.D. Va. 19 May 2012) (quoting *Wilkins v. Sec'y Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991)). Remand is required if the court concludes that the Commissioner's decision is not supported by substantial evidence based on the record as supplemented by the evidence submitted at the Appeals Council level. *Id.* at *l-2.

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Commissioner has considered all relevant evidence and sufficiently explained the weight given to probative evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

### OVERVIEW OF PLAINTIFF'S CONTENTION

Plaintiff asserts that the ALJ's decision should be reversed and SSI benefits awarded or, alternatively, that the case should be remanded for a new hearing on the grounds that the ALJ erred by: (1) determining that she does not meet or medically equal Listings 12.04 or 1.02; (2) not adequately considering or addressing plaintiff's obesity; (3) not giving proper weight to certain opinion evidence; and (4) finding that plaintiff had the RFC to perform light work. Each ground is addressed in turn below.

### DISCUSSION

### I.  ALJ'S DETERMINATION ON LISTINGS 12.04 AND 1.02

#### A.  Applicable Legal Principles

The Listings consist of impairments, organized by major body systems, that are deemed sufficiently severe to prevent a person from doing any gainful activity. 20 C.F.R. § 416.925(a). Therefore, if a claimant's impairments meet a listing, that fact alone establishes that the claimant is disabled. *Id*. § 416.920(d). An impairment meets a listing if it satisfies all the specified medical criteria. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); Soc. Sec. Ruling 83-19, 1983 WL 31248, at *2 (1983). Generally, these criteria are set out in a diagnostic description of the impairment followed by criteria relating to its severity. *See*, *e.g.*, Listing 12.00A. The burden of

demonstrating that an impairment meets a listing rests on the claimant. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

Even if an impairment does not meet the listing criteria, it can still be deemed to satisfy the listing if the impairment medically equals the criteria. 20 C.F.R. § 416.925(c)(5). To establish such medical equivalence, a claimant must present medical findings equal in severity to all the criteria for that listing. *Sullivan*, 493 U.S. at 531; 20 C.F.R. § 416.926(a) (providing that medical equivalence requires that the impairment "be at least equal in severity and duration to the listed criteria"). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531.

## B.    Listing 12.04

Listing 12.04 provides:

12.04 *Affective Disorders:* Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:
   a.    Anhedonia or pervasive loss of interest in almost all activities; or
   b.    Appetite disturbance with change in weight; or
   c.    Sleep disturbance; or
   d.    Psychomotor agitation or retardation; or
   e.    Decreased energy; or
   f.    Feelings of guilt or worthlessness; or
   g.    Difficulty concentrating or thinking; or
   h.    Thoughts of suicide; or
   i.    Hallucinations, delusions, or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:
    a.      Hyperactivity; or
    b.      Pressure of speech; or
    c.      Flight of ideas; or
    d.      Inflated self-esteem; or
    e.      Decreased need for sleep; or
    f.      Easy distractibility; or
    g.      Involvement in activities that have a high probability of painful consequences which are not recognized; or
    h.      Hallucinations, delusions or paranoid thinking;
or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration[5];

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.04.

---

[5] For the first three functional areas, the ratings, in order of increasing level of limitation, are none, mild, moderate, marked, and extreme. *See* 20 C.F.R. § 416.920a(c)(4); Listing 12.00C1-3. The last area—repeated episodes of decompensation, each of extended duration—means three episodes within one year or an average of one every four months, each lasting at least two weeks. *See* Listing 12.00C4.

The ALJ found that the "severity of the claimant's mental impairment does not meet or medically equal the criteria of listing 12.04," and, more specifically, that her mental impairment does not satisfy either the paragraph B or paragraph C criteria. Tr. 14-15 ¶ 3. The ALJ did not address whether plaintiff satisfied the diagnostic description in Listing 12.04 or the paragraph A criteria. Nevertheless, because satisfaction of Listing 12.04 requires satisfaction of both the paragraph A and B criteria or the paragraph C criteria, the ALJ's determination, if proper, is sufficient to establish that she does not satisfy the listing.

Although plaintiff argues that the ALJ should have found that she satisfies Listing 12.04, she fails to specify which paragraphs, A and B and/or C, she contends she satisfies or the criteria within particular paragraphs she contends she satisfies. Instead, she simply recites selected evidence she contends relates to the listing. Pl.'s Mem. 8. The evidence she cites does not appear to relate to the paragraph C criteria, and she therefore appears not to be contesting the ALJ's ruling that she does not satisfy those criteria.[6] Instead, the evidence appears to relate to the criteria in section 1 of paragraphs A and those in paragraph B. Because the ALJ did not make a determination regarding the paragraph A criteria, the issue raised by plaintiff's contention is whether the ALJ erred in his determination that plaintiff failed to satisfy the paragraph B criteria. The court finds no error.

The ALJ explained his determination regarding the paragraph B criteria as follows:

---

[6] As to the paragraph C criteria, the ALJ found:

> The medical records do not indicate the claimant has a history of major depression for at least two years duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support. The medical records fail to indicate repeated episodes of decompensation, each of extended duration. The medical records fail to indicate a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demand or change in the environment would be predicted to cause the claimant to decompensate. Moreover, the medical records fail to indicate a current history of one or more years inability to function outside a highly supportive living arrangement with an indication of continued need for such arrangement.

Tr. 14 ¶ 3. Substantial evidence supports this determination.

In activities of daily living, the claimant has mild restriction. The claimant testified that her weight and knee pain limits her functioning, but she cooks, and does minimal chores of laundry, bathroom cleaning, mopping, and sweeping in short increments. (Ex. 2F). She is able to handle her own personal care, and make sure her kids are bathed, and up and ready for school[.]

In social functioning, the claimant has moderate difficulties. The claimant does not socialize much but she has a few friends that come over to visit. She said she has mood swings, she is irritable and angry, and there was some paranoia with interacting with others. (Ex. 3F, 9F).

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The evidence shows the claimant has been observed as hypomanic and distractible, and this is consistent with her testimony that she has difficulty focusing. (Ex. 3F, 9F).

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. The evidence does not show the claimant has experienced episodes of decompensation of extended duration.

Tr. 14 ¶ 3.

Substantial evidence supports the ALJ's determination on paragraph B. The supporting evidence includes the evidence the ALJ cites.

In addition, the ALJ reviewed other evidence in his decision regarding plaintiff's mental impairment that supports his determination on the paragraph B criteria:

As for the claimant's psychiatric history, the evidence shows the claimant was seen for treatment at Family Preservation Services of N.C. ["FPS"]. At her April 17, 2012 appointment, the notes show she was doing well and not manic or depressed. She was in a good mood, had good sleep, and good energy. The notes go on to show on April 2, 2013, but she was still depressed. She was started on Lithium, and on May 21, 2013, she was better and doing more. The mental status examination shows that she was distractible and a little hypomanic, but she was much improved and assessed with a global assessment of functioning (GAF)[7] score of 65, which indicated she had mild

---

[7] The GAF scale measures a person's overall psychological, social, and occupational functioning. Am. Psych. Assn., *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. text rev. 2000) ("DSM–IV–TR"). The GAF scale is "intended to be used to make treatment decisions" and has "no direct legal or medical correlation to the severity requirements of social security regulations." *Powell v. Astrue*, 927 F. Supp. 2d 267, 273 (W.D.N.C. 2013). Nonetheless, it may inform the ALJ's judgment as to whether a claimant is disabled. *Kozel v. Astrue*, No. JKS-10-2180, 2012 WL 2951554, at *10 (D. Md. 18 July 2012). Notably, the current, fifth edition of the DSM, which was issued on 13 May 2013 prior to the 9 October 2014 issuance of the ALJ's decision, abandoned use of the GAF scale

symptoms or difficulty functioning. (Ex. 3F). She continued to receive treatment, and was switched to Wellbutrin. On November 27, 2013, the claimant had good eye contact she was hyperactive, and her gait, station, strength, and tone were all within normal limits. She exhibited some pressured, loud, loquacious speech. She had fair insight and judgment and intact attention and concentration. At this appointment, the claimant was assessed with a GAF score of 60, which indicated the claimant had moderate symptoms. (Ex. 9F).

---

because of "its lack of conceptual clarity . . . and questionable psychometrics in routine practice." Am. Psych. Assn., DSM-5 16 (2013). However, in internal guidance messages, one predating and one postdating the ALJ's decision, the Social Security Administration ("SSA") instructed that ALJs were to continue to treat GAF scores as opinion evidence that must be considered. *See* SSA, AM-13066, "Global Assessment of Functioning (GAF) Evidence in Disability Adjudication" (effective 22 July 2013); SSA, AM-13066 REV, "Global Assessment of Functioning (GAF) Evidence in Disability Adjudication – REV" (effective 14 Oct. 2014).

Selected GAF scores have the following meanings:

90-81 Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members).

80-71 If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork).

70-61 Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

60-51 Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

50-41 Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

40-31 Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

30-21 Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

DSM–IV–TR 34.

The evidence shows the claimant continued to have some medication adjustments, and was started on Lithium and Latuda. On January 21, 2014, she said that she slept six hours a night, and she spent time at home with her children. On April 22, 2014, Lisa Hasan, MHS PA-C, noted the claimant's Lithium level was non therapeutic. She reported taking her medication regularly, but Ms. Hasan questioned her compliance. Her dosage was increased again. She was stable but her weight was up to 306 pounds. On July 28, 2014, the claimant said she was not as irritable but continued to feel sad and overwhelmed, and she wanted to increase her medication. She exhibited fair eye contact, normal psychomotor activity, a normal thought process, poor judgment and insight, and although she was sad, she was stable with a GAF of 55 that indicated moderate symptoms. The claimant was on a high dose of [L]ithium and she was started on Prozac 10 mg. (Ex. 9F).

Tr. 18-19 ¶ 4.[8]

The ALJ also explained why he did not find plaintiff's mental impairment to be disabling:

As for her bipolar disorder, there is evidence of distractibility and hypomania, but she was better with therapy and medication, and this is consistent with her testimony. In May 2013, the claimant was assessed with a GAF [of 65] indicating she had only mild symptoms. She did continue to have some bipolar symptoms, but there was also some question as to her medication compliance. Although, she continued to have symptoms, she was stable and continued to function, handle her daily activities, and interact with others.

Tr. 19 ¶ 4.

Additional evidence supporting the ALJ's determination on the paragraph B criteria is the 23 January 2013 opinions of consulting state agency psychologist W.W. Albertson, Ed.D. (Tr. 68-69, 71-71) and the 28 March 2013 opinions of consulting state agency psychiatrist Bonny Gregory, M.D. (Tr. 91-92, 95-97). The ALJ gave these opinions "great weight," stating:

---

[8] The fact that the reasons underlying an ALJ's listing determination are not all set out at step three of the sequential analysis does not constitute legal error where the decision read as a whole makes them clear. *See, e .g., Smith v. Astrue*, No. 11–1574, 2011 WL 6188731, at *1 (4th Cir. 14 Dec. 2011); *Lydia v. Astrue*, No. 2:11–1453–DCN–BHH, 2012 WL 3304107, at *5 (D.S.C. 25 Jul. 2012) ("This sort of deconstruction of the ALJ's decision [ ] is not useful. The ALJ's decision must be read as a whole."), *report & recomm. adopted by* 2012 WL 3308108, at *1 (13 Aug. 2012); *Finley v. Astrue*, No. 5:08–CV–209–D(l), 2009 WL 2489264, at *5 (E.D.N.C.) ("[T]he ALJ's decision may appropriately be read 'as a whole.'" (quoting *Jones v. Barnhart*, 364 F.3d 501, 504–05 (3rd Cir. 2004))), *mem. & recomm. accepted by* 2009 WL 2489264, at *1 (E.D.N.C. 13 Aug. 2009).

As for the opinion evidence, W.W. Albertson, Ed.D, and Bonny Gregory, M.D., stated the claimant has a *mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration*.  Dr. Albertson and Dr. Gregory both said the claimant is able to perform simple, routine, repetitive tasks in a low stress, low social demand work environment with continued treatment and medication management. (Ex. 4A, 8A).  These opinions are given great weight as she has remained able to care for herself and her children.  The claimant's symptoms from her bipolar disorder are controlled with continued medication management and therapy, but she does have mood swings and crying spells, so she would function best in a low stress, low social demand environment as the evidence shows she is easily excitable and distractible.

Tr. 19 ¶ 4 (emphasis added).

The evidence that plaintiff cites in support of her contention that the ALJ erred in his paragraph B determination consists of the fact of her treatment for her mental impairments since March 2012; assignment of a GAF score of 34 to her on three occasions by a person at FPS, indicating major impairment in several areas (*see* DSM-IV-TR 34); an unsigned and undated medical source statement from FPS; and her own testimony about her mental impairments and activities of daily living.  *See* Pl.'s Mem. 8.

This evidence, particularly when considered with the other relevant evidence of record, does not compel a determination that plaintiff satisfied the paragraph B criteria.  Moreover, it is apparent that the ALJ considered this evidence and weighed it against the other evidence of record.  By her argument, plaintiff invites the court to reweigh the evidence.  It is not, of course, the court's role to do so.

With respect to plaintiff's mental health treatment history, as set out above, the ALJ's decision includes a review of the records of plaintiff's treatment from FPS, starting in 2012 and continuing to 2014.  *See* Tr. 18-19 ¶ 4.  While the ALJ does not mention plaintiff's initial visit on 6 March 2012, he does mention her visit on 17 April 2012, citing Exhibit 3F.  Tr. 18 ¶ 4.  The

notes on the 6 March 2012 visit (Tr. 386-448) are also contained in this exhibit. An ALJ, of course, is not required to discuss every piece of evidence. *See, e.g., Smith v. Colvin*, No. 4:14–CV–12–FL, 2015 WL 1249875, at *1 (E.D.N.C. 20 Jan. 2015) (citing *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014)).

The records showing a GAF score of 34 (Tr. 392, 406, 412) are also contained in Exhibit 3F. This score was reported on three dates spanning a period of only four months—29 November 2012, 28 January 2013, and 26 March 2013. They contrast with the other GAF scores assigned plaintiff, including a score of 65 on 21 May 2013 (Tr. 431), just two months after the last report of the score of 34; 60 on 27 November 2013 (Tr. 498); and up to 55 (*i.e.*, 50-55) on 28 July 2014 (Tr. 478). The ALJ referenced these other GAF scores in his decision. *See* Tr. 18 ¶ 4; 19 ¶ 4; 20 ¶ 4. In light of this GAF score evidence and the other relevant evidence, the court finds that the ALJ properly discounted the GAF scores of 34 plaintiff received.

The ALJ discussed, at length, the medical source statement plaintiff cites. *See* Tr. 20 ¶ 4. As explained further below, the ALJ properly gave it "little to no weight." Tr. 20 ¶ 4. Notably, as interpreted by the ALJ, the statement indicated that plaintiff has "a mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, she has deficiencies in concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner, and episodes of decompensation unknown." Tr. 20 ¶ 4. These findings do not satisfy the paragraph B criteria.

In addition, the ALJ discussed plaintiff's testimony regarding her mental impairments and activities of daily living. He stated:

> The claimant said she is bipolar, and she has been on and off medication for the last 10 years. She has gotten better, but she is still irritable, angry, has mood swings, crying spells, difficulty sleeping and difficulty focusing. . . . Around the

house, the claimant testified she is able to cook with a chair, and her ex-husband had someone come and clean up twice a week. She is able to grocery shop with a scooter. The claimant testified that she has girl friends that come over, and at night, she is able to make sure her kids take baths and get their clothes ready for school; she has a 7-year old and a 10-year old.

Tr. 15-16 ¶ 4. While plaintiff also testified that her impairments prevented her from working (*see* Tr. 16 ¶ 4), the ALJ found that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." Tr. 16 ¶ 4. Plaintiff does not directly challenge the ALJ's credibility determination and the court finds it to be proper. *See Craig*, 76 F.3d at 593-96; 20 C.F.R. § 416.929(a)-(c); Soc. Sec. Ruling 96-7p, 1996 WL 374186, at *1n. 1, *2 (2 July 1996).

The court concludes that the ALJ properly found plaintiff not to meet or medically equal Listing 12.04. The court accordingly rejects plaintiff's challenge to it.

## C.    Listing 1.02

Listing 1.02 provides in relevant part[9]:

1.02 *Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in *inability to ambulate effectively*, as defined in 1.00B2b; . . . .

Listing 1.02 (emphasis added).

The "inability to ambulate effectively" refers to "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to

---

[9] Listing 1.02 also includes a paragraph B setting out alternative severity criteria relating to the ability to perform fine and gross movement with the upper extremities. Listing 1.02B. Plaintiff does not challenge the ALJ's determination that she does not satisfy the paragraph B criteria. *See* Tr. 14 ¶ 3.

independently initiate, sustain, or complete activities" and "is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a handheld assistive device(s) that limits the functioning of both upper extremities." Listing 1.00B2b(1). Examples of ineffective ambulation "include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." *Id.* (2).

The ALJ found that plaintiff did not satisfy Listing 1.02A because "the record does not show that the claimant has major dysfunction of any joint, or signs of inflammation or deformity in two or more joints, resulting in an inability to ambulate effectively." Tr. 14 ¶ 3. After misstating the requirements of Listing 1.02A, plaintiff cites selected evidence purportedly demonstrating that the ALJ erred by not finding that she satisfied the criteria of paragraph A. As with Listing 12.04, she fails to relate the evidence she cites to the specific criteria in Listing 1.02. Significantly, she does not even assert that she suffers from the "inability to ambulate effectively." The court finds that substantial evidence supports the ALJ's determination on plaintiff's ability to ambulate for purposes of Listing 1.02A and that plaintiff's contention to the contrary is meritless.

The evidence supporting the ALJ's determination includes the following evidence he discusses in his decision:

> The evidence shows the claimant has a history of arthritis of the knees, but she had remained able to extend and flex her knees until recently as noted in her July 2014 appointment. It was not until around June-July 2014 that any surgical options were even considered as she had been maintained on steroid injections and urged to lose weight. In July 2012, she had x-rays done that showed only mild degenerative changes. In March 2013, a year after her alleged onset date, the

claimant was still cooking, doing laundry, bathroom cleaning, mopping, sweeping, and shopping. Her motor strength was 5/5, and there was some difficulty with flexing her knees and squatting, but she did not use a cane and there was no mention of difficulty ambulating.[10]  In November 2013, the claimant was noted to have a normal gait, station, tone, and strength. The claimant's knees remained stable, and she had a good response to Synvisc-One injections. The claimant was still able to fully extend in May 2014, and it was not until June 2014 that she had a limp. Thus, the claimant was managed with injections, and just recently it appeared that her arthritis worsened [and it] was suggested that she undergo bariatric surgery and then total knee replacement. The claimant's weight was her primary problem, so her doctors wanted to get her weight down before proceeding to knee surgery because of her young age. However, even with her weight, she was able to take care of her home in increments and take care of her children.

Tr. 19 ¶ 4; *see also* Tr. 16-18 ¶ 4 (ALJ's detailed review of treatment records relating to plaintiff's knees).

In addition, as the ALJ discussed, plaintiff was noted not to be using at cane at certain medical visits. On her 13 May 2013 visit with G. Hadley Callaway, M.D. of Raleigh Orthopaedic Clinic ("ROC"), "the claimant was described as overweight, but she walked without a cane or other support." Tr. 17 ¶ 4 (referencing Tr. 458). Similarly, at her examination with

---

[10] The ALJ's findings regarding plaintiff as of March 2013 appear to be based on the report of consulting physician William Clark, M.D. on his 22 March 2013 evaluation of plaintiff (Tr. 382-84). Plaintiff does not challenge the ALJ's finding that "there was no mention of difficulty ambulating" apparently in Dr. Clark's report. Tr. 19 ¶ 4. This finding has support in the statement by plaintiff recited in Dr. Clark's report that plaintiff "can walk without assistance but on occasion, walks with a cane." Tr. 383. In addition, Dr. Clark did not himself make an explicit finding that plaintiff had difficulty ambulating. Nonetheless, the report does reference statements by plaintiff ostensibly alleging difficulty ambulating in one way or another, among them, that she "has to lean on a cart" when shopping (Tr. 383), "needs to use a 'buggy'" in stores (Tr. 384), and "[c]an only walk about 20 paces due to her knees" (Tr. 383). If in light of these additional statements the ALJ's finding that "there was no mention of difficulty ambulating" were deemed erroneous, such posited error would be harmless; if corrected, it could not reasonably be expected to change the outcome of the decision. *See Love-Moore v. Colvin*, No. 7:12–CV–104–D, 2013 WL 5350870, at *2 (E.D.N.C. 24 Sept. 2013); *see also Garner v. Astrue*, 436 F. App'x 224, 226 n.* (4th Cir. 2011) (applying *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)); *Huffman v. Colvin*, No. 1:10CV537, 2013 WL 4431964, at *4 & n. 7, 7 (M.D.N.C. 14 Aug. 2013); *Presnell v. Colvin*, No. 1:12–CV–299–FDW, 2013 WL 4079214, at *6 (W.D.N.C. 13 Aug. 2013). Among other reasons, the ALJ summarized Dr. Clark's report in detail earlier in his decision, referring expressly to her statements about leaning on shopping carts and using a buggy. *See* Tr. 16-17 ¶ 4. It is therefore clear that the ALJ considered the statements by plaintiff reflected in Dr. Clark's report alleging difficulty ambulating. Further, the ALJ's analysis would not have been materially altered had he stated that there was "some mention" of difficulty ambulating, as opposed to "no mention."

Bradley Vaughn, M.D. of ROC on 31 July 2014[11] it was noted that "[plaintiff] was not using a cane." Tr. 18 ¶ 4 (referencing Tr. 468). Although not noted by the ALJ, physician's assistant Pamela Burleson, PA-C of ROC reported at her 19 May 2014 visit with plaintiff that she "ambulates without the assistance of any ambulatory assistive devices." Tr. 463.

It is true that plaintiff reported some use of a cane or walker. She reported to consulting physician William Clark, M.D. during his 22 March 2013 examination of her that she used a cane "on occasion" (Tr. 383) and at home (Tr. 384; *see also* Tr. 16 ¶ 4 (ALJ's reference to such use)), and in a 11 July 2014 visit to Lori A. McLamb, PA-C of ROC that she usually uses a cane or walker at home (Tr. 508). But there does not appear to be any evidence that plaintiff consistently used a cane, let alone two canes or a walker, for ambulation, as Listing 1.02A contemplates with respect to such assistive devices.

The additional evidence plaintiff submitted to the Appeals Council included the note on a visit by plaintiff to ROC on 6 February 2015, at which she was provided a prescription for a cane. Tr. 503. Significantly, this visit postdates by four months the ALJ's decision and the prescription was solely for a cane, not a walker. This evidence does not deprive the ALJ's Listing 1.02 determination of the support of substantial evidence of record. *See generally Felts*, 2012 WL 1836280, at *1.

The evidence to which plaintiff points in challenging the ALJ's Listing 1.02A determination is her history of suffering with bilateral knee pain since at least July 2011; imaging reports on 1 and 17 July 2012 showing degenerative, arthritic, and related changes in plaintiff's knees (Tr. 335, 353-54); the findings by Dr. Clark in his report on his 22 March 2013 examination of plaintiff that she needed almost two people to help her on and off the examination table and that her knees were worsening and limiting (Tr. 382, 384); and the results

---

[11] The ALJ's decision misstates the date of this visit as "July 13, 2014." Tr. 18 ¶ 4.

of a 28 May 2014 MRI of plaintiff's right knee (Tr. 461-62). *See* Pl.'s Mem. 9. The fact that plaintiff has had bilateral knee pain for an extended period and the results of the imaging do not themselves, of course, establish the functional loss required for the "inability to ambulate effectively." Nor do the findings by Dr. Clark plaintiff cites. The ALJ's decision indicates that he considered and weighed all this evidence. Again, it is not the court's role to reweigh it.

The court concludes that the ALJ's determination regarding Listing 1.02 was proper. The court accordingly rejects it.

## II.     ALJ'S EVALUATION OF PLAINTIFF'S OBESITY

Social Security Ruling 02-1p requires that an ALJ consider the effects of a claimant's obesity on his ability to perform routine movement and necessary physical activity in the workplace and make findings explaining his assessment of such effects. Soc. Sec. Ruling 02-1p, 2000 WL 628049, at *6-7 (12 Sept. 2000). Plaintiff argues that the ALJ failed to meet these requirements. The contention is meritless.

As indicated, at step two of the sequential analysis, the ALJ expressly found claimant's obesity to be a severe impairment. *See* Tr. 13 ¶ 2. The ALJ thereby determined that it imposed more than a minimal limitation on plaintiff's physical or mental ability to do basic work activities. *See* Soc. Sec. Ruling 85–28, 1985 WL 56856, at *3 (1 Jan. 1985) (providing that an impairment is not severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered"); *see also* 20 CF.R. § 416.920(c) (providing that an impairment is severe only if it "significantly limits . . . [a claimant's] physical or mental ability to do basic work activities").

The ALJ again addressed plaintiff's obesity at step three of the sequential analysis, as part of his determination on the Listings:

There are no Listing of impairments criteria for obesity. However, the Administrative Law Judge has considered the impact of obesity, as discussed in Social Security Ruling 02-[]1p, at each step of the sequential adjudication process.

Tr. 13 ¶ 3.

In determining plaintiff's RFC, the ALJ made repeated references to plaintiff's weight. The references included the following: "[Plaintiff] testified that she is 5'5 and weighs 300 pounds." (Tr. 15 ¶ 4 (referencing Tr. 30-31)); the consultative examination of plaintiff by Dr. Clark on 22 March 2013 showed that she "was 291 pounds at 5'3" (Tr. 16 ¶ 4 (referencing Tr. 383)); an examination of plaintiff by physician's assistant Burleson on 5 May 2014 "revealed that [plaintiff] was overweight" (Tr. 17 ¶ 4 (referencing Tr. 466)); the follow-up examination of plaintiff by physician's assistant Burleson on 19 May 2014 found that plaintiff was "quite frustrated by her limited physical activities due to her knee and weight gain" and that "weight loss would help significantly with her knees" (Tr. 17 ¶ 4 (referencing Tr. 464)); the examination of plaintiff on 2 June 2014 by Dr. Callaway found that she had extensive arthritis throughout her right knee "most extensively involving weight bearing" and that she needed a knee replacement, but "[t]he only hesitation would be that she was overweight" (Tr. 17-18 ¶ 4 (referencing Tr. 460)); and the examination of plaintiff by Dr. Vaughn on 31 July 2014 showed that "her primary problem was her weight" and Dr. Vaughn stated that he "supported any attempt at weight loss that [plaintiff] desired" and "referred [her] to Bariat[r]ic Center for weight loss," noting that "there would be no need for surgical intervention on the knee until the claimant had a significant amount of weight loss" (Tr. 18 ¶ 4 (referencing Tr. 468)). The ALJ also gave "great weight" to the 26 March 2013 opinions of nonexamining state agency consulting physician Jack

Drummond, M.D., who found that plaintiff's obesity, along with decreased range of motion and pain in her knees and osteoarthritis, imposed on her exertional and postural limitations almost identical to those included by the ALJ in his RFC determination. Tr. 20 ¶ 5 (referencing Tr. 93-94).

In addition, as referenced in the foregoing discussion of the ALJ's Listing 1.02 determination, the ALJ discussed why he found plaintiff's weight not to be disabling:

> In July 2012, she had x-rays done that showed only mild degenerative changes. In March 2013, a year after her alleged onset date, the claimant was still cooking, doing laundry, bathroom cleaning, mopping, sweeping, and shopping. Her motor strength was 5/5, and there was some difficulty with flexing her knees and squatting, but she did not use a cane and there was no mention of difficulty ambulating. In November 2013, the claimant was noted to have a normal gait, station, tone, and strength. The claimant's knees remained stable, and she had a good response to Synvisc-One injections. The claimant was still able to fully extend in May 2014, and it was not until June 2014 that she had a limp. Thus, the claimant was managed with injections, and just recently it appeared that her arthritis worsened was suggested that she undergo bariatric surgery and then total knee replacement. *The claimant's weight was her primary problem, so her doctors wanted to get her weight down before proceeding to knee surgery because of her young age. However, even with her weight, she was able to take care of her home in increments and take care of her children.*

Tr. 19 ¶ 4 (emphasis added).

Further, of course, the ALJ's RFC determination contained limitations responsive to plaintiff's obesity. These were limitation of plaintiff to light work; standing and walking for only four hours in an eight hour day; pushing and pulling with the lower extremities on only an occasional basis; and climbing stairs, bending, stooping, kneeling, crouching, and crawling on only an occasional basis. Tr. 15 ¶ 5. Social Security Ruling 02-1p recognizes such limitations as those that may be the consequence of obesity. *See* Soc. Sec. Ruling 02-1p, 2000 WL 628049, at *6.

At step four, the ALJ found plaintiff unable to perform her past relevant work because of the obesity-responsive exertional and postural limitations of her RFC, as well as the mental limitations. *See* Tr. 20-21 ¶ 5. At step five, the ALJ included the obesity-responsive limitations in the RFC in the hypothetical he provided the vocational expert and on the basis of whose subsequent testimony the ALJ determined that there were jobs in significant numbers in the national economy that plaintiff could perform. *See* Tr. 21-22 ¶ 9; 50-52.

Plaintiff argues that the ALJ erred by not specifically analyzing the impact of her obesity on her ability to work and not adequately addressing the effects that her obesity would have on her other impairments. The foregoing review belies this contention. Moreover, plaintiff points to no specific limitations resulting from her obesity that the ALJ did not include in his RFC determination and hypothetical to the vocational expert, or any evidence substantiating any such additional limitations.

The court concludes that the ALJ did adequately consider and address the potential effects of claimant's obesity on her ability to perform work-related activities throughout the sequential analysis. The court accordingly rejects plaintiff's challenge to the ALJ's handling of claimant's obesity.

## III. ALJ'S EVAUATION OF OPINION EVIDENCE

### A. Applicable Legal Standards

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). An ALJ must consider all medical opinions in a case in determining

Case 5:15-cv-00478-FL   Document 25   Filed 07/19/16   Page 23 of 33

whether a claimant is disabled. *See id.* § 416.927(c); *Nicholson v. Comm'r of Soc. Sec. Admin.*, 600 F. Supp. 2d 740, 752 (N.D.W. Va. 2009) ("Pursuant to 20 C.F.R. § 404.1527(b), an ALJ must consider all medical opinions when determining the disability status of a claimant.").

The Regulations provide that opinions of treating physicians and psychologists on the nature and severity of impairments are to be accorded controlling weight if they are well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 416.927(c)(2); *see Craig*, 76 F.3d at 590; *Ward v. Chater*, 924 F. Supp. 53, 55-56 (W.D. Va. 1996); Soc. Sec. Ruling 96-2p, 1996 WL 374188 (2 July 1996). Otherwise, the opinions are to be given significantly less weight. *Craig*, 76 F.3d at 590. In this circumstance, the Regulations prescribe factors to be considered in determining the weight to be ascribed, including the length and nature of the treating relationship, the supportability of the opinions, and their consistency with the record. 20 C.F.R. § 416.927(c)(2)-(6).

The ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *5; *see also* 20 C.F.R. § 416.927(c)(2); *Ashmore v. Colvin*, No. 0:11-2865-TMC, 2013 WL 837643, at *2 (D.S.C. 6 Mar. 2013) ("In doing so [*i.e.*, giving less weight to the testimony of a treating physician], the ALJ must explain what weight is given to a treating physician's opinion and give specific reasons for his decision to discount the opinion.").

The factors used to determine the weight to be accorded the opinions of physicians and psychologists (and other "acceptable medical sources") not given controlling weight also apply

to the opinions of providers who are deemed to be at a different professional level (or so-called "other sources"), including physician's assistants. *See* Soc. Sec. Ruling 06-03p, 2006 WL 2329939, at *2, 4 (9 Aug. 2006); *see also* 20 C.F.R. § 416.913(d) (partial listing of "other sources"). As with opinions from physicians and psychologists, the ALJ must explain the weight given opinions of other sources and the reasons for the weight given. *See* Soc. Sec. Ruling 06-03p, 2006 WL 2329939, at *6; *Napier*, 2013 WL 1856469, at *2. The fact that an opinion is from an acceptable medical source may justify giving that opinion greater weight than an opinion from a source that is not an acceptable medical source, although circumstances can justify giving opinions of sources that are not acceptable sources greater weight. Soc. Sec. Ruling 06-03p, 2006 WL 2329939, at *5.

The same basic standards that govern evaluation of the opinions of treating medical sources not given controlling weight and explanation of the weight given such opinions apply to the evaluation of opinions of examining, but nontreating sources, and nonexamining sources. *See* 20 C.F.R. § 416.927(c), (e); *Casey v. Colvin,* No. 4:14–cv–00004, 2015 WL 1810173, at *3 (W.D. Va. 12 Mar. 2015), *report & recomm. adopted by* 2015 WL 1810173, at *1 (21 Apr. 2015); *Napier v. Astrue*, No. TJS-12-1096, 2013 WL 1856469, at *2 (D. Md. 1 May 2013). More weight is generally given to the opinions of a treating source than to the opinions of a nontreating examining source and to the opinions of an examining source than the opinions of a nonexamining source. *See* 20 C.F.R. § 416.927(c)(1), (2). Under appropriate circumstances, however, the opinions of a nontreating examining source or a nonexamining source may be given more weight than those of a treating source. *See*, *e.g.*, Soc. Sec. Ruling 96-6p, 1996 WL 374180, at *3 (2 July 1996).

Opinions from medical sources on the ultimate issue of disability and other issues reserved to the Commissioner are not entitled to any special weight based on their source. *See* 20 C.F.R. § 416.927(d); Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *2, 5 (2 July 1996). But these opinions must still be evaluated and accorded appropriate weight. *See* Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *3 ("[O]pinions from any medical source on issues reserved to the Commissioner must never be ignored. The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner.").

### B.     FPS Medical Source Statement

One set of opinions whose evaluation by the ALJ plaintiff challenges is set out in an unsigned and undated medical source statement issued by FPS. The statement consists of two preprinted forms, one entitled "§ 8:60 Medical statement concerning bipolar disorder and related conditions for Social Security disability claim" (Tr. 470-73) and the other "§ 8:64 Medical statement concerning depression with anxiety, OCD, PTSD or panic disorder for Social Security disability claim" (Tr. 474-75).[12] For the most part, the forms call for the person completing them to mark which of the preprinted responses the person selects, as opposed to answering open-ended questions.

The ALJ gave the opinions expressed in the medical source statement "little to no weight." Tr. 20 ¶ 4. He summarized the opinions set out in the statement and his assessment of them as follows:

---

[12] When referring to the medical source statement, plaintiff cites to only Tr. 470-73, which pages comprise the first preprinted form. *See* Plaintiff.'s Mem. 5, 8, 14. Nevertheless, in describing the contents of the medical source statement, she includes a finding unique to the second form, that plaintiff has generalized persistent anxiety. *See id.* at 5, 8, 14. Other findings from the medical source statement recited by plaintiff—anhedonia, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty thinking or concentrating—appear in both forms. *See id.* at 5, 8, 14; Tr. 470, 474. Plaintiff's discussion of the contents of the medical source statement is therefore consistent with the ALJ's interpretation that it includes both forms. This interpretation is a reasonable one, particularly in the absence of any evidence to the contrary.

A form was completed concerning the claimant's mental abilities by [FPS], and it notes the claimant was first seen on January 21, 2014 and last seen on April 22, 2014 for bipolar disorder. The claimant has panic attacks and suffers from recurrent and intrusive recollections of a traumatic experience which could be the source of marked distress. She is markedly impaired in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in the work setting, travel to unfamiliar places or use public transportation. The claimant experiences anhedonia, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty thinking or concentrating, and generalized persistent anxiety. The claimant has a mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, she has deficiencies in concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner, and episodes of decompensation unknown. The notes show the claimant had not been seen long enough to speak to work situations as she had not worked. (Ex. 8F). This opinion is given little to no weight as it is not signed, and the undersigned is unable to determine the author. Additionally, this opinion is only based on a four month period, and it is not consistent with evidence of a GAF of 65 indicating only mild difficulties functioning, improved sleep, normal thought process, spending time with her children, and taking care of her household.

Tr. 20 ¶ 4.

In challenging the ALJ's assessment, plaintiff states that the ALJ "afforded no weight to this opinion because . . . he was unable to determine the author." Pl.'s Mem. 14. This assertion is plainly incorrect. The lack of identification of the author was only one of several bases for the ALJ's discounting the opinions expressed in the medical source statement.

Plaintiff goes on to argue that the ALJ was obligated under the Regulations to obtain clarification from FPS of the identity of the author. The argument has no merit.

The Regulations, 20 C.F.R. § 416.920b, provide in relevant part:

We consider evidence to be inconsistent when it conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques.
    . . . .

(b) If any of the evidence in your case record, including any medical opinion(s), is inconsistent, we will weigh the relevant evidence and see whether we can determine whether you are disabled based on the evidence we have.

(c) *If . . . after weighing the evidence we determine we cannot reach a conclusion about whether you are disabled*, we will determine the best way to resolve the inconsistency or insufficiency. . . .

(1) We may recontact your treating physician, psychologist, or other medical source. We may choose not to seek additional evidence or clarification from a medical source if we know from experience that the source either cannot or will not provide the necessary evidence. If we obtain medical evidence over the telephone, we will send the telephone report to the source for review, signature, and return; . . . .

20 C.F.R. § 416.920b(b), (c) (emphasis added).[13]

The medical source statement from FPS is arguably "inconsistent evidence" within the meaning of 20 C.F.R. § 416.920b because of the lack of identification of its author. Nonetheless, as the emphasized language above makes clear, the regulation provides for contacting a medical source for clarification only if the ALJ cannot determine whether the claimant is disabled after weighing the evidence. 20 C.F.R. § 416.920b(c)(1); *see Wilson*, 2014 WL 69609, at *7. There was ample evidence in the record here for the ALJ to determine whether plaintiff was disabled, as his comprehensive review in his decision of the medical evidence (which spans over 250 pages (*see* Tr. 65-74, 86-99, 275-517)) and of the other evidence of record illustrates.

The burden rested on plaintiff to demonstrate that she was disabled. Submission of a medical source statement lacking the identification of the source is one aspect of her failure to meet that burden.

_____

[13] Plaintiff cites to the provisions of the Regulations, 20 C.F.R. §§ 416.912(e) and 927(c)(3), that 20 C.F.R. § 416.920b supplanted effective 26 March 2012, before issuance of the ALJ's decision on 9 October 2014. *See* "How We Collect and Consider Evidence of Disability," 77 Fed. Reg. 10651-01 (SSA 23 Feb. 2012) (final rule); "How We Collect and Consider Evidence of Disability," 76 Fed. Reg. 20282-01 (SSA 12 Apr. 2011) (notice of proposed rulemaking). The pertinent standard, though, is the same under both the current and prior provisions. *Wilson v. Colvin*, No. 5:12–CV–762–FL, 2014 WL 69609, at *7 (E.D.N.C.), *mem. & recommend. adopted by* 2014 WL 69609, at *1 (8 Jan. 2014).

The ALJ's attribution of little to no weight to the medical source statement is supported by substantial evidence, including the evidence he cites. Plaintiff does not specifically challenge the evidentiary support for the ALJ's assessment, stating simply that the statement should have been given proper weight.

The court concludes that plaintiff's challenge to the ALJ's handling of the medical source statement from FPS is without merit. The court therefore rejects it.

## C.      Dr. Clark's Report

Plaintiff argues that the ALJ failed to give proper weight to the opinions purportedly expressed by Dr. Clark in the report on his 22 March 2013 evaluation of plaintiff and, indeed, failed to address at all the weight he gave the opinions. The purported opinions at issue are Dr. Clark's statements that plaintiff "needs almost two people to help her get up and off of a single step examination table"; "[she] almost certainly [has] degenerative arthritis to both knees"; "[t]he right knee was x-rayed in July of 2012 [see Tr. 454] that showed arthritis in all three compartments . . . [and the] left knee clinically appears just as bad"; "[h]er knees are getting worse . . . [and] [t]hey certainly are limiting"; and "[s]he also has extensive psychiatric problems." Tr. 382, 384. Plaintiff's contention is without merit.

Under the Regulations, as noted, "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). The statements by Dr. Clark cited by plaintiff are not opinions, but merely findings. They do not reflect his judgment regarding the nature and severity of plaintiff's impairments or the limitations they impose on her. See, e.g., Flores v.

*Colvin*, No. 1:13CV513, 2016 WL 831941, at *6 (M.D.N.C. 29 Feb. 2016), *mem. op. & recommend. adopted by* 2016 WL 3102023, at *2 (2 June 2016); *Mitchell v. Astrue*, Civ. No. 2:11-cv-00056-MR, 2013 WL 678068, at *5 (W.D.N.C. 25 Feb. 2013).

Even if the statements by Dr. Clark cited by plaintiff were deemed opinions, they are consistent with the ALJ's RFC determination. That determination is manifestly grounded, for example, on the determinations that plaintiff knee impairment is limiting and that she has extensive psychiatric problems. Therefore any deemed error by the ALJ in not addressing the weight accorded Dr. Clark's statements would be harmless. *See*, *e.g.*, *Love-Moore*, 2013 WL 5350870, at *2. For this and the other reasons stated, the court rejects plaintiff's challenge to the ALJ's handling of Dr. Clark's statements.

## IV.    ALJ'S RFC DETERMINATION

A claimant's RFC is the most the claimant can do despite his impairments. 20 C.F.R. § 416.945(a)(1). The RFC must be determined on the basis of all the relevant evidence of record. *Id.*

Plaintiff contends that there is not substantial evidence of record supporting the ALJ's RFC determination that plaintiff can perform a limited range of light work. Instead, she contends that her testimony and other evidence establishes that, in addition to the limitations recognized by the ALJ, she would be off task 15 to 20 percent of the workday due to her impairments or be absent from work 1 to 2 days per month due to medical appointments or symptoms and that with these additional limitations she would be unable to perform work at any exertional level, citing the vocational expert's testimony to this effect. *See* Tr. 52-53.

Contrary to plaintiff's contention, the court finds that substantial evidence does support the ALJ's RFC determination. Such evidence includes evidence reviewed in his decision. Much

of this evidence was discussed previously with respect to the ALJ's determinations on Listings 12.04 and 1.02.

To support her contention, plaintiff cites to the fact of her treatment for bipolar disorder, osteoarthritis of the knees, and obesity since at least July 2011 (*see* Tr. 339); the results of an MRI of her right knee on 28 May 2014 (Tr. 461-62); Dr. Clark's notations that she needed almost two people to help her get on and off the examination and that her knees were getting worse and were limiting (Tr. 382, 384); the recommendation by Dr. Callaway of ROC on 2 June 2014 that plaintiff obtain a knee replacement after losing weight (Tr. 460); and her own testimony regarding her height, weight, and weight gain as a side effect of medication (Tr. 30-31). Pl.'s Mem. 11-12. The ALJ clearly considered all of this evidence and discussed almost all of it in his decision. *See* Tr. 16 ¶ 4 ("On July 17, 2011, she had a left knee x-ray done . . . ."); Tr. 17 ¶ 4 ("The claimant had a magnetic resonance imaging (MRI) scan done, and on June 2, 2014, Dr. Hadley Callaway stated that the MRI showed extensive arthritis throughout the knee most extensively involving weight bearing."); 17 ¶ 4 (Dr. Clark found "[h]er knees were worsening and were limiting."); Tr. 18 ¶ 4 ("The claimant had end stage osteoarthritis, and Dr. Callaway said she needed to go ahead and get a knee replacement. The only hesitation would be that she was overweight."); Tr. 15 ¶ 4 ("She testified that she is 5'5 and weighs 300 pounds.").

Plaintiff also cites several pieces of additional evidence submitted for the first time to the Appeals Council: the statement in the notes by physician's assistant McLamb of ROC on her 11 July 2014 visit with plaintiff that plaintiff had limited mobility due to her knee pain and usually used a cane or walker at home (Tr. 508); and the statements by Liz Fuller, PA of ROC on her 6 February 2015 visit with plaintiff that she would be a candidate for surgery on her knees after she lost weight (Tr. 502). This evidence is largely cumulative. As the ALJ recited in his

decision, the report of Dr. Clark on his 22 March 2013 evaluation of plaintiff that she said she used a cane at home. *See* Tr. 16 ¶ 4 (referencing Tr. 384). While physician's assistant Fuller's notes do not specify the type of surgery she discussed with plaintiff, assuming it was knee replacement, the notion that plaintiff would be a candidate for it was already reflected at other points in the record: Dr. Clark's report; the notes of Dr. Vaughn on his 31 July 2014 visit with plaintiff (*see* Tr. 468; *see also* Tr. 18 ¶ 4 (ALJ's discussion of Dr. Vaughn's notation on knee replacement)); and the notes of physician's assistant Burleson on her 19 May 2014 visit with plaintiff (*see* Tr. 464; *see also* Tr. 17 ¶ 4 (ALJ's discussion of this finding)). In any event, plaintiff's visit with physician's assistant Fuller postdates the ALJ's decision by four months and is therefore arguably not relevant to the period of alleged disability at issue. The additional evidence plaintiff cites certainly does not deprive the ALJ's RFC determination of the support of substantial evidence in the record as a whole.

Ultimately, by her argument, plaintiff is again inviting the court to reweigh the evidence. And, again, the court declines to do so. For this and the other reasons stated, the court rejects plaintiff's challenge to the ALJ's RFC determination.

## CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that the Commissioner's motion (D.E. 21) for judgment on the pleadings be GRANTED, plaintiff's motion (D.E. 17) for judgment on the pleadings be DENIED, and the Commissioner's final decision be AFFIRMED.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until 2 August 2016 to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct her own review (that is, make a de novo determination) of those portions of the

Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).**

Any response to objections shall be filed within 14 days after the filing of objections.

This 19th day of July 2016.

James E. Gates
United States Magistrate Judge